UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALYCIA SHERMAN,                       :
                                      :CIVIL ACTION NO. 3:15-CV-281
          Plaintiff,                  :
                                      :(JUDGE CONABOY)
          v.                          :
                                      :
CAROLYN W. COLVIN, Acting             :
Commissioner of the Social            :
Security Administration,              :
                                      :
          Defendant.                  :
_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  Plaintiff originally alleged an inability to work due to depression and anxiety.  (R. 189.)  In her application, Plaintiff said she stopped working because of her conditions on June 30, 2011.  (*Id.*)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's severe impairments of Posttraumatic Stress Disorder ("PTSD"), Depression, and Anxiety did not alone or in combination meet or equal the listings.  (R. 14.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations and that she was capable of performing jobs that existed in significant numbers in the national economy.  (R. 15-20.)  The ALJ therefore

found Plaintiff was not disabled under the Act from October 9, 2010, through the date of the decision, May 31, 2013.  (R. 21.)

With this action, Plaintiff asserts that she should be awarded benefits or the case should be remanded for further proceedings based on the following errors: 1) the ALJ did not properly apply the treating physician rule;  2) the ALJ did not include all impairments supported by the medical evidence in his hypothetical questions to the Vocational Expert; 3) the ALJ erred in giving significant weight to Plaintiff's Global Assessment of Functioning scores; and 4) the ALJ erred in not finding Plaintiff fully credible.  (Doc. 8 at 9-10, 17-18.)

After careful consideration of the administrative record and the parties' filings, we conclude Plaintiff's appeal is properly denied.

## I. Background

### A.   *Procedural Background*

On July 13, 2011, Plaintiff protectively filed applications for DIB and SSI.  (R. 11.)  Plaintiff alleges disability beginning on October 9, 2010.  (*Id.*)  The claim was initially denied on November 7, 2011.  (*Id.*)  Plaintiff filed a request for a review before an ALJ on December 12, 2011. (*Id.*)  On April 18, 2013, ALJ Theordore Burock held a hearing at which Plaintiff and Vocational Expert Terry P. Leslie testified.  (*Id.*)  At the hearing, Plaintiff was represented by Attorney Stephen J. Hogg.  (*Id.*)  The ALJ issued

2

his unfavorable decision on May 31, 2013, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 21.)

On July 18, 2013, Plaintiff filed a Request for Review with the Appeals Council.  (R. 6-7.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on December 17, 2014.  (R. 1-4.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On February 9, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on April 16, 2015.  (Docs. 4, 5.)  Plaintiff filed her supporting brief on June 26, 2015.  (Doc. 8.)  Defendant filed her opposition brief on July 27, 2015.  (Doc. 9.)  Plaintiff filed a reply brief on August 4, 2015.  (Doc. 10.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on April 23, 1991, and was nineteen years old on the alleged disability onset date.  (R. 20.)  Plaintiff has a high school education and some college credits.  (R. 30.)  Plaintiff does not have past relevant work, testifying that she has had numerous short-term jobs since 2007.  (R. 20, 30.)  As noted by her attorney at the ALJ hearing, Plaintiff was diagnosed with PTSD, depression and anxiety principally arising from the stillborn birth

3

of twins in October 2010.  (R. 26.)  He also noted that Plaintiff
had some attempts at work since that time but no job lasted more
than a few months as her anxiety increased dramatically in the work
setting.  (*Id.*)

## 1.   **Impairment Evidence**

Our review of the evidence focuses on evidence relevant to
Plaintiff's claimed errors.

Plaintiff was treated by Kristen H. Gennett, LCSW, of Franco
Phsychological Associates in Carlisle, Pennsylvania, beginning in
January 2009.  (R. 496.)  Plaintiff sought therapy due to
depression and living in a dysfunctional family.  (*Id.*)  Ms.
Gennett noted that Plaintiff was seen a total of twenty-one times
(from January 21, 2009, through December 3, 2009) at which point
Plaintiff's case was closed.  (*Id.*)  During the course of therapy,
Plaintiff worked on stabilizing her mood and keeping safe using
medication prescribed by Carlisle Pediatrics.  (*Id.*)

Ms. Gennett saw Plaintiff again on September 30, 2010.  (R.
496.)  The reason for Plaintiff's return to therapy was mood
stabilization and "grief work since she was pregnant with twins and
lost them both."  (*Id.*)  Ms. Gennett reported that "this course of
therapy lasted only four sessions so not much work had been
accomplished."  (*Id.*)

On November 19, 2010, Plaintiff saw Lisa Myers, D.O., with the
chief complaints of anxiety and depression.  (R. 318.)  This visit

4

followed Plaintiff's September 9, 2010, emergency caesarean section when, at twenty-eight weeks gestation, one of her twin daughters was stillborn and one died shortly after delivery. (*Id.*) Subjectively, Dr. Myers recorded the following:

> Patient reports symptoms of fatigue, sadness, nervousness, irritability, mood swings, loss of interest, decreased energy level, increased sleep, guilty thoughts and appetite increase. These symptoms have been present for 3 months. She admits to suicidal ideation. Pt is currently taking no medications. Pt has been seeing a counselLor [sic] who suggested that she see me for treatment with medications. Pt also requests something for sleep. Although she has been sleeping a lot, she is unable to sleep at night, but sleeps through much of the day. Pt has previous history of depression and was treated successfully with citalopram.

(R. 318.) Plaintiff was started on Celexa (citalopram) and Zolpidem, the latter to be used for a couple weeks to re-establish normal sleep patterns. (R. 319.) Plaintiff reported that she was trying to get pregnant and Dr. Myers cautioned her about possible birth defects with the use of citalopram. (*Id.*) Plaintiff was to follow up with her psychologist and see Dr. Myers again in three weeks. (*Id.*)

Plaintiff saw Dr. Myers again on December 20, 2010, for follow up. (R. 316.) Plaintiff reported that she had no improvement with her symptoms of fatigue, insomnia, sadness, and suicidal thoughts. (*Id.*) Although Dr. Myers noted Plaintiff was doing well on her current medication regimen, she changed some medications and

5

discontinued the citalopram because it was not working.  (R. 316-17.)

In correspondence dated July 5, 2011, Dr. Myers indicated that Plaintiff was seen on July 5, 2011, at Primary Care Associates of Carlisle on that date and would be able to return to work on July 7, 2011.  (R. 362.)

On July 13, 2011, Nancy Fenstermacker, Psy.D., of Pinnacle Health noted in an initial intake assessment that Plaintiff was experiencing residual depression as a result of losing twins in September 2010.  (R. 364.)  She diagnosed major depression, assessed a GAF of 60, and recommended cognitive behavioral therapy. (*Id.*)  Plaintiff was three months pregnant at the time and denied taking any medications.  (*Id.*)  The assessment also indicated the following problem areas: Vocational/Educational - noted that "Pt cannot work"; Social/Environmental - noted that "Pt has withdrawn"; Behavioral - noted that "Pt has been traumatized"; Legal - noted that "Legal intervention has increased stress"; Financial - noted that "Pt has no income"; and Health - noted that "Pt's health is at risk [and] [s]he feels unsupported by her PCP[,] will seek a psychiatrist[,] her ob-gyn . . . has been exceptionally helpful." (R. 501.)

Plaintiff saw Dr. Fenstermacher again on August 5, 2011, and August 17, 2011.  (R. 498.)

On September 16, 2011, Dr. Fenstermacher completed a

6

disability questionnaire.  (R. 396-97.)  In the area of
understanding, remembering, and carrying out instructions, Dr.
Fenstermacher found that Plaintiff had marked difficulties in
understanding and remembering short, simple instructions,
understanding and remembering detailed instructions and carrying
out detailed instructions.  (R. 396.)  She found that Plaintiff had
no difficulty carrying out short, simple instructions and moderate
difficulty making judgments on simple work-related decisions.
(*Id.*)  Dr. Fenstermacher noted that the clinical finding supporting
the assessment was that Plaintiff's depression impaired her
cognitive functioning.  (*Id.*)  In the area of responding
appropriately to supervision, co-workers, and work pressure, Dr.
Fenstermacher found the following: Plaintiff had marked limitations
interacting appropriately with the public and supervisors, and
responding appropriately to pressures in a usual work setting and
changes in a routine work setting; and Plaintiff had moderate
limitations in her ability to interact appropriately with co-
workers.  (*Id.*)  In support of these findings, Dr. Fenstermacher
noted that "[d]epression interferes with judgment and patients
withdraw as an emotional protection cognitive reasoning is
diminished."  (*Id.*)  Other areas found to be diminished were
"cognitive, deciding, STM, organizing, motivation, interest,
energy, anxiety."  (R. 397.)  Dr. Fenstermacher also noted that
Plaintiff "manages her life moderately well in a stress free

7

environment.  However, she is <u>not</u> capable emotionally, cognitively, or behaviorally to return to work at this time.  She will be re-evaluated in 6 months."  (*Id.*)

On July 29, 2011, Plaintiff saw Dr. Myers for follow up.  (R. 314.)  Dr. Myers recorded the following: "Pt is pregnant and suffers from depression and needs paperwork filled out for disability.  She reports her counsellor [sic] advised her that she should go on disability."  (*Id.*)  Plaintiff reported some improvement of insomnia and denied suicidal ideation.  (*Id.*)  Plaintiff was not taking any medications at the time.  (*Id.*)  Dr. Myers diagnosed depression.  (*Id.*)

In Dr. Fenstermacher's April 11, 2012, Treatment Summary, she noted that Plaintiff had been seen seven times since her intake in July 2011 and she was being discharged on April 11, 2012.  (R. 499.)  Plaintiff's baby accompanied her to the visit and Plaintiff reported that she continued to be fearful about the baby's death.  (R. 499, 502.)  Plaintiff was not taking any medication due to negative side effects of psychotropic medications and the plan was for her to see a psychiatrist for medications and return to Dr. Fenstermacher as needed.  (R. 499.)  Plaintiff's diagnosis at discharge included PTSD.  (*Id.*)  The Treatment Summary indicates that Plaintiff's GAF at admission was 55-60 and at discharge was 65-70.  (*Id.*)

On May 2, 2012, Plaintiff saw Rahat Taswir, M.D., at Holy

Spirit Hospital Behavioral Health Center in Camp Hill, Pennsylvania.  (R. 480-82.)  Dr. Taswir noted that Plaintiff suffered from depression and had been living with her boyfriend for the previous two years but might move back in with her grandparents due to relationship issues.  (R. 480.)  At the time, Plaintiff was unemployed and looking for work, she was in counseling and seeking a change in medication.  (R. 488-81.)  Her chief complaint at the visit was tiredness.  (R. 480.)  Dr. Taswir's mental status exam showed that Plaintiff's affect was restricted and her mood appeared depressed but she had good eye contact, and was alert and oriented with adequate intelligence, mentation and cognition.  (R. 481.)  He diagnosed depressive disorder and assessed a GAF of 60.  (*Id.*)  Dr. Taswir started Plaintiff on Cymbalta, noted she could continue to take Ambien as needed, and he encouraged her to see a therapist more often if possible.  (*Id.*)  He planned to see her again in three weeks.  (*Id.*)

On May 30, 2012, Plaintiff again was observed to have a restricted affect and depressed mood and Plaintiff reported that she felt worse.  (R. 483.)  The "Treatment Plan Update" is mostly illegible but "not seen therapist in a while" can be made out. (*Id.*)

On July 26, 2012, Plaintiff's mood was anxious and her affect restricted.  (R. 484.)  Dr. Taswir noted that Plaintiff's anxiety was "still there--mostly while driving or in car with someone."

(*Id.*)  Plaintiff also reported that she had broken up with her boyfriend the previous month and she was living with her grandparents.  (*Id.*)  Again, much of the note is illegible.

Plaintiff had an Initial Assessment at Franco Psychological Associates on March 18, 2013.  (R. 490.)  Heidi B. Roeder, MS LPC, LMFT, noted that Plaintiff presented with an increase in depression and anxiety and she was not taking medication at the time due to pregnancy.  (*Id.*)  Plaintiff's affect was appropriate and her mood depressed and anxious. (R. 492.)  Her judgment and insight were impaired.  (*Id.*)  Ms. Roeder found Plaintiff to be moderately impaired regarding her occupation in that she had trouble staying employed.  (*Id.*)  Plaintiff was unemployed and living with her grandparents, and her pregnancy was unplanned.  (R. 492-93.)  Regarding "Psychological History," Ms. Roeder noted that Plaintiff had a history of depression and had sought treatment but had poor follow through.  (R. 494.)  She also noted that Plaintiff had been prescribed Paxil, Celexa, Lorazepam, and Klonopin by Dr. Taswir but she did not follow her medication regimen and needed a medication evaluation.  (*Id.*)  Ms. Roeder hypothesized that Plaintiff's problems were related to low self esteem and she had a history of depression and anxiety situational to her living situation and multiple pregnancies.  (*Id.*)  She assessed Plaintiff with a GAF of 61, noting psychological stressors of unemployment, high risk pregnancy and limited supports.  (R. 495.)  She recommended weekly

cognitive behavioral therapy.  (R. 490.)

On March 18, 2013, Ms. Roeder noted that Plaintiff continued to be depressed and anxious related to situational difficulties. (R. 491.)  Ms. Roeder had reviewed Plaintiff's previous records and commented that Plaintiff appeared to be minimally compliant with treatment--she discontinued medications without consulting a doctor, she changed providers numerous times, and did not appear to follow up with treatment since she had the twenty visits in 2009. (*Id.*)

On April 1, 2013, Plaintiff reported to Ms. Roeder that she had gotten into an argument with her boyfriend who is the father of her children and minimally involved in parenting with her.  (R. 488.)  Plaintiff reported she had applied for Social Security and a hearing was scheduled for April 22, 2013.  (*Id.*)

On April 10, 2013, Plaintiff told Ms. Roeder that she was struggling to care for her fifteen-month-old daughter without the father's involvement.  (R. 486.)  Plaintiff said she hoped to go to school but had minimal finances.  (*Id.*)  Ms. Roeder noted that although the grandparents helped with housing and childcare, they were not in optimal physical health, and more social services were needed in the case.  (*Id.*)

2.   **Opinion Evidence**

In addition to the opinions of Dr. Fenstermacher and Ms. Roeder set out above, Stanley E. Schneider, Ed.D., performed a

clinical psychological disability evaluation on October 26, 2011 (R. 402-10), and the November 4, 2011, assessment of Plaintiff's impairments by State agency psychological consultant Salvatore Cullari, Ph.D., is set out in the Disability Determination Explanation for Plaintiff's SSI and DIB claims (R. 59-74).

Dr. Schneider noted that Plaintiff was twenty-seven weeks pregnant at the time and had last worked on June 30, 2011, for Direct Brands doing direct sales over the phone. (R. 403.) Plaintiff had started the job in April 2011 and, when asked what happened to the job, she responded that she "didn't like it" and "felt abused by customers." (*Id.*) She said she was fired after being off for two days due to pink eye. (*Id.*) Plaintiff told Dr. Schneider she was applying for disability because of the depression, she had a lot of jobs she could not handle physically, and she also referenced anxiety. (*Id.*) When asked if she could work, Plaintiff said she was easily offended and too depressed, adding "I don't sleep and I can't get out of bed." (R. 404.) At the time of the evaluation, Plaintiff was on no medications for her depression and anxiety due to her pregnancy. (R. 407.)

During the interview, Dr. Schneider noted minimal anxiety and her mood and affect were both anxious and depressed. (R. 406.) He also noted that she was highly sensitive, easily hurt, and emotionally vulnerable. (*Id.*) He found that Plaintiff was oriented x3, had no memory impairment, had adequate attention and

concentration, acceptable judgment, and good insight.  (R. 407.)
Dr. Schneider diagnosed "Major Depressive Disorder, recurrent, mild
to moderate without psychotic features" and PTSD; he found her
prognosis to be guarded.  (*Id.*)  On the disability questionnaire,
Dr. Schneider opined that Plaintiff had moderate limitations in her
ability to understand and remember detailed instructions, interact
appropriately with supervisors and co-workers, and a marked
limitation in her ability to respond appropriately to work
pressures in a usual work setting.  (R. 409.)

Dr. Cullari opined that Plaintiff had mild restriction of
activites of daily living, mild difficulties in maintaining social
functioning and maintaining concentration, and no repeated episodes
of decompensation, each of extended duration.  (R. 64.)  He found
her claimed impairments of depression and anxiety were not severe.
(R. 64.)  Dr. Cullari noted that Plaintiff's outpatient mental
health treatment appeared to be inconsistent and her
depression/anxiety somewhat reactive to some recent events and her
pregnancy.  (*Id.*)

## 3.  **Function Reports**

Plaintiff completed a Function Report on August 8, 2011.  (R.
209-16.)  She noted she was living with the father of her child at
the time.  (R. 209.)  In response to the question of how
Plaintiff's conditions limited her ability to work, Plaintiff
provided the following explanation:

13

> If I'm not happy with what I'm doing I will
> quit or stop doing it.  Being happy is
> important to me.  With the jobs I have had I
> wasn't happy.  I don't handle well, customers
> and managers yelling at me or telling me I
> done something incorrectly it upsets me,
> makes me feel I shouldn't be there.

(R. 210.)  Plaintiff described her daily activities to include making breakfast, going to morning classes at a college, making lunch, watching TV, playing on the computer, doing homework and going to bed.  (R. 210.)  Plaintiff noted that she was pregnant and planned to care for her baby with the help of the baby's father. (*Id.*)  In addition to preparing meals, Plaintiff stated that she did housework, drove a car, shopped for groceries and house supplies, payed bills and handled finances, and spent time with others at their houses or going out to eat about twice a week.  (R. 212-14.)  Plaintiff said her conditions caused problems with memory, completing tasks, and concentration, explaining that "[i]t's very hard for me to be happy in a job.  If I'm not happy with what I'm doing and if the people are treating me bad I will quit."  (R. 214.)  Plaintiff indicated that she finishes what she starts, and she follows written and spoken instructions with no problems.  (*Id.*)  Plaintiff noted she did not handle stress well and has trouble with authority figures if they yell at her.  (R. 215.)

Clarence Garlin, Plaintiff's stepfather, completed a Third Party Function Report on August 9, 2011.  (R. 219-26.)  He had

14

known Plaintiff for seven years and he said she came to visit him once or twice a week.  (R. 219.)  Mr. Garlin said he did not know how Plaintiff's conditions affected her ability to work.  (*Id.*)  He confirmed that Plaintiff does some cooking and household chores, drove, got out every day, shopped, handled her finances, and socialized, and was good at following written and spoken instructions.  (R. 221-24.)  He noted she was "ok" at getting along with authority figures, was "good" at changes in routine, but was "not good" at handling stress.  (R. 225.)

**4.   Hearing Testimony**

Plaintiff testified at the ALJ hearing on February 21, 2013, that she was living with her grandparents at the time and her one year old daughter (born on January 17, 2012) lived with her.  (R. 28-29.)  As noted above, she testified that she has had about ten short-term jobs since 2007.  (R. 30.)  When asked about the limited duration, Plaintiff responded that she gets "very anxious" and doesn't "want to go to work."  (*Id.*)  She added that the anxiety makes her nauseous and so she doesn't go to work and "call[s] off numerous times."  (R. 31.)

Plaintiff said she has no income and does not receive child support though the father of her child is working and sees his daughter.  (R. 31.)  Plaintiff testified that she is her daughter's primary caregiver and she is anxious about her daughter's wellbeing after losing her twins.  (R. 32.)

15

At the time of the hearing, Plaintiff was seeing Heidi Roeder every two weeks for counseling.  (R. 32.)  Plaintiff was not on any medications for her mental health issues but was taking an over-the-counter sleeping pill.  (R. 33.)  She said she was not taking medications because she was pregnant and had gone off them when she learned of the pregnancy.  (*Id.*)  Plaintiff noted that her depression and anxiety level had gotten worse since going off the medications.  (*Id.*)

When asked how her depression presents, Plaintiff said she cries a lot, relives the loss of her twins, worries about her living daughter, and worries about her pregnancy.  (R. 34-35.)  As for her anxiety/panic attacks, she stated that her heart races, she sweats, and she clenches her fists.  (R. 35.)  This occurs about four times a week.  (*Id.*)

In addition to jobs which lasted about two weeks at Borders and Amazon, since October 2010 Plaintiff also worked as a photo technician at Target part-time for about six months.  (R. 39-41.) Plaintiff said she quit because she was pregnant with her daughter but, when asked if she otherwise would have stayed, she said she would not because her manager treated her badly.  (R. 41-42.) Plaintiff also testified about other short-term positions she had held since October 2010 including Aerotech (from which she was fired after three months for calling off a lot after she became pregnant), Shieks (which she quit because she didn't like the

work), and a bank teller position (which she quit because of anxiety over her drawer being short and handling others' money). (R. 43-44.)  Plaintiff testified that she did not notice any difference in her depression and anxiety levels regarding her job performances whether she was on or off medication.  (R. 47.)

The ALJ presented the VE with a hypothetical individual of Plaintiff's age and education, with no past relevant work and "no limitations, not exertionally limited to routine, repetitive tasks with GED of 111, no public contact, occasional interaction with co-workers and supervisors with occasional up to one-third of the day."  (R. 52.)  ALJ Burock asked VE Leslie whether there were any unskilled light jobs such an individual could perform.  (*Id.*) The VE testified that the individual would be able to perform jobs including hotel housekeeper, produce weigher, bottling line attendant, and conveyor baker worker.  (R. 52-53.)  If such an individual could not sustain concentration and attention for performance of routine, repetitive tasks, or could not interact appropriately with the public, co-workers and supervisors, the VE testified there were no jobs that individual could perform.  (R. 53.)  The VE also testified that if the hypothetical individual had a serious limitation in responding to work pressure, gainful employment would be precluded.  (R. 55-56.)

5.   **ALJ Decision**

By decision of May 31, 2013, ALJ Burock determined that

Plaintiff was not disabled as defined in the Social Security Act from October 9, 2010, through the date of the decision.  (R. 27-28.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.
>
> 2.   The claimant has not engaged in substantial gainful activity since October 9, 2010, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq.)*.
>
> 3.   The claimant has the following severe impairments: Posttraumatic Stress Disorder, Depression, and Anxiety (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to performing work that requires only routine and repetitive tasks and requires only a general educational development level of 1 in reasoning, 1 in mathematics, and 1 in language skills.  The claimant is limited to performing work that requires no contact with the public and only occasional interaction with co-workers and supervisors.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on April 23, 1991 and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964)

9.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from October 9, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 13-21.)

ALJ Burock thoroughly reviewed the medical and opinion evidence.  (R. 16-19.)  The ALJ gave limited weight to Dr. Schneider's opinion regarding Plaintiff's limitations because he found them inconsistent with Dr. Schneider's objective clinical findings, "including the claimant's ability to perform serial 5's, that the claimant presented with no memory impairment and adequate attention and concentration[,] . . . that the claimant presented

19

with minimal anxiety and was able to maintain eye contact during the examination." (R. 18.)

He gave limited weight to Dr. Fenstermacher's opinion because the record indicates that she had only treated Plaintiff for a few months before rendering her opinions about Plaintiff's limitations, and her findings regarding Plaintiff's cognitive and social abilities were inconsistent with objective clinical findings of record, including those of Dr. Schneider and Dr. Taswir. (R. 18.)

ALJ Burock gave no weight to the assessment form completed by Dr. Myers for the Pennsylvania Department of Welfare in which she stated that Plaintiff was "temporarily disabled" from August 5, 2011, to April 28, 2012, due to her depression. (R. 19.) The ALJ's decision regarding this opinion was based on the fact that it addressed an issue reserved for the Commissioner, Dr. Myers provided no support for her determination, and her finding is not supported by the evidence of record. (*Id.*)

The ALJ did not agree with Dr. Cullari's determination that Plaintiff's depression and anxiety were not severe impairments. (R. 19.) He gave "appropriate weight" to Mr. Garlin's opinion expressed in the Third Party Function Report. (*Id.*)

The ALJ also reviewed Plaintiff's testimony and statements regarding the limitations caused by her conditions. (R. 16, 19.) He provided the reasons he did not find Plaintiff's conditions not as limiting as alleged, including that her conditions may be

20

effectively treated with therapy and medication, she does not take her medication while pregnant and Dr. Myers noted her depression had been successfully treated with medication in the past, several notations from providers indicated Plaintiff's condition had improved, Plaintiff testified that counseling was helpful, there are no medical records to support her claimed anxiety attacks, her treatment is conservative and intermittent, and her activities of daily living are inconsistent with her claimed limitations.  (R. 19.)

After extensively reviewing Plaintiff's statements about her activities and the limiting effects of her impairments, the ALJ determined that Plaintiff was not entirely credible, finding the objective medical evidence did not support the degree of limitation alleged and citing specific bases for the credibility determination.  (R. 22-25.)

Consistent with the testimony of the VE, the ALJ found that Plaintiff was able to perform jobs which exist in significant numbers the national economy.  (R. 20-21.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C.

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

   If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the

---

§ 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing work that existed in significant numbers in the national economy.  (R. 20-21.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for

adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative

evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision

is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07. Neither the reviewing court nor the defendant "may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the

substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.   *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts that she should be awarded benefits or the case should be remanded for further proceedings based on the following errors: 1) the ALJ did not properly apply the treating physician rule;  2) the ALJ did not include all impairments supported by the medical evidence in his hypothetical

questions to the Vocational Expert; 3) the ALJ erred in giving significant weight to Plaintiff's Global Assessment of Functioning scores; and 4) the ALJ erred in not finding Plaintiff fully credible.  (Doc. 8 at 9-10, 17-18.)

## 1.   **Treating Physician Rule**

First, Plaintiff maintains the ALJ did not properly apply the treating physician rule because he gave limited weight to the opinions of Dr. Fenstermacher and Dr. Myers.  (Doc. 8 at 12-14.) We disagree.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  The "treating physician rule," is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we

will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[2] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

> "Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Controlling weight is given when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46. *Horst* noted that neither the ALJ nor the court needed to rely on the treating physician's opinion that the plaintiff was completely disabled: "As an initial matter, 'the ALJ--not treating or examining physicians or State agency

30

consultants--must make the ultimate disability and RFC determinations." 551 F. App'x at 46 n.7 (quoting *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20 C.F.R. § 404.1527(d)). Although it is true that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence, *Morales v. Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

Here Dr. Fenstermacher's opinion is not entitled to the weight suggested by Plaintiff. (*See* Doc. 8 at 12-14; Doc. 10 at 2-3.) The ALJ provided the reasons he attributed limited weight to Dr.

Fenstermacher's opinions regarding Plaintiff's limitations and those reasons are supported by the record. (*See* R. 18.) Regarding the duration of Dr. Fenstermacher's treatment, Plaintiff points to the nine-month treatment period from July 13, 2011, to April 11, 2012, in contrast to the ALJ's notation that Dr. Fenstermacher had treated Plaintiff for only a few months when she rendered her opinions. (Doc. 8 at 12.) While Plaintiff is correct that Dr. Fenstermacher first saw Plaintiff in July 2011 and last saw her in April 2012, the ALJ's assessment of the treating relationship is correct in that Plaintiff had only an intake assessment and three visits with Dr. Fenstermacher when the opinions were rendered in September 2011. (*See* R. 498.) We also note that Dr. Fenstermacher stated in her September 16, 2011, assessment that she would re-evaluate Plaintiff in six months. (R. 387.) Thus, although she opined that Plaintiff had the limitations identified and was unable to work as of September, Dr. Fenstermacher did not project they would last for a duration beyond six months. Importantly, Plaintiff was discharged from treatment in April 2012 after being seen seven times (to return as needed) and there was no further evaluation of the limitations identified in September 2011. (*See* R. 499.)

Seen in context, the ALJ did not err when he considered the clinical findings of Dr. Taswir and Dr. Schneider in comparison to Dr. Fenstermacher's opinions. Plaintiff does not argue that Dr.

Taswir's and Dr. Schneider's clinical findings do not support the ALJ's decision. Further, contrary to Plaintiff's assertion, there is no inconsistency in the ALJ's citation to Dr. Schneider's *clinical findings* and his assignment of limited weight to Dr. Schneider's *opinion* regarding Plaintiff's limitations--the ALJ did not find Dr. Schneider's clinical findings unreliable. As set out above, the ALJ provided reasons for his determintaion: he gave limited weight to Dr. Schneider's opinion regarding Plaintiff's limitations because he found them inconsistent with Dr. Schneider's objective clinical findings, "including the claimant's ability to perform serial 5's, that the claimant presented with no memory impairment and adequate attention and concentration[,] . . . that the claimant presented with minimal anxiety and was able to maintain eye contact during the examination." (R. 18.)

Furthermore, the ALJ did not err in assigning no weight to Dr. Myers' disability assessment. (R. 19.) Plaintiff does not dispute the ALJ's assertion that this is an issue reserved for the Commissioner. (*See* R. 19; Doc. 8 at 13, 14.) While the ALJ could consider Dr. Myers' opinion on this matter, he was under no obligation to do so. Moreover, Dr. Myers' opinion does not support a finding of disability: for Social Security purposes, the claimant's alleged disability must have lasted or be expected to last for twelve consecutive months, 20 C.F.R. §§ 404.1505(a), 416.905(a), and Dr. Myers' projected duration was less than nine

months.   (R. 389.)

In sum, our review of the record and the ALJ's consideration of the evidence shows that ALJ Burock's determination is consistent with the treating physician's rule and relevant legal authority.

## 2.   <u>**Vocational Expert Hypothetical**</u>

Plaintiff next asserts that the ALJ erred because he did not include all impairments supported by the medical evidence in his hypothetical questions to the Vocational Expert.   (Doc. 8 at 14-15.)   Specifically, Plaintiff cites the marked limitation in responding to usual work pressure assessed by Dr. Fenstermacher and Dr. Schneider.   (Doc. 8 at 14.)   We conclude this claimed error is without merit.

As Defendant notes, an attack on an ALJ's hypothetical question is essentially an attack on the ALJ's RFC assessment. (Doc. 9 at 20 n.4 (citing *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005)).)   Also as noted, the ALJ (not the opinion of a medical source) is responsible for determining a claimant's RFC. (Doc. 9 at 20 (citing 20 C.F.R. §§ 404.1545(a), 404.1546(c), 416.945(a), 416.946(c)).)   The Third Circuit Court of Appeals has held that to accurately portray a claimant's impairments, the ALJ must include all "credibly established limitations" in the hypothetical.   *Rutherford*, 399 F.3d at 554 (citing *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999)).   In *Zirnsak v. Colvin*, 777 F.3d 607 (3d Cir. 2014), our Circuit Court summarized the

34

framework set out in *Rutherford* for consideration of whether a limitation is credibly established:

> First, limitations that are supported by medical evidence and are "otherwise uncontroverted in the record" *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical. [*Rutherford*, 399 F.3d at 554]. However, where a limitation is supported by medical evidence, but is opposed by other by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical. *Id.* This discretion is not unfettered--the ALJ cannot reject evidence of a limitation for an unsupported reason. *Id.* Finally, the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible.

777 F.3d at 614-15 (citing *Rutherford*, 399 F.3d at 554).

ALJ Burock did not conclude that the findings of Dr. Fenstermacher and Dr.Schneider were entitled to more than limited weight and, as discussed previously, he cited adequate reasons for his determinations.  (R. 18.)  Thus, the ALJ did not find the assessments regarding Plaintiff's limitation in responding to work pressure credibly established.  In the *Rutherford* context set out above, even if we consider the opinions of Dr. Fenstermacher and Schneider supportive medical evidence, this evidence was contradicted by the other evidence cited by the ALJ and the situation falls into the second category where an ALJ is free to choose not to include the work pressure limitation in his hypothetical.  On this basis, we find no error in the ALJ's

35

hypothetical as drafted.

**3.**   **Global Assessment of Functioning Scores**

Plaintiff asserts that the ALJ erred in giving significant weight to Plaintiff's GAF scores. (Doc. 8 at 15-16.)  We disagree.

A GAF score was traditionally used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults." *See Irizarry v. Barnhart*, 233 F. App'x 189, 190 n.1 (3d Cir. 2007) (not precedential)s.  The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest. *See Debaise v. Astrue*, No. 09-0591, 2010 WL 597488, at *5 n.7 (W.D. Pa. Feb. 16, 2010); *see also Diagnostic and Statistical Manual of Mental Disorders,* 32-34 (4th ed. text rev. 2000) ("DSM-IV").  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  DSM-IV at 34.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.*  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*  A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*  A GAF score of 61-70 represents some mild symptoms or some difficulty in social,

occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.* A GAF score of 71-80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. *Id.*

Pursuant to Social Security Administration rules, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009) (citing 66 Fed. Reg. 50746, 50764-65 (2000)).

While the significance and use of GAF scores has been debated since the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded from considering GAF scores as evidence. As explained in *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741 (M.D. Pa. Apr. 10, 2015),

> "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual [of Mental Disorders] ("DSM-5")." *Solock ex rel. F.A.R.P v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 5d,* 16 (2013)). "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of

37

> clarity ... and questionable psychometrics in
> routine practice." *See* Am. Psychiatric Ass'n,
> Diagnostic and Stat. Manual of Mental
> Disorders, DSM-516 (5th ed. 2013). In
> response, the Social Security Administration
> now allows ALJs to use GAF ratings as opinion
> evidence when assessing disability claims
> involving mental disorders; however, a "GAF
> score is never dispositive of impairment
> severity," and thus an ALJ should not "give
> controlling weight to a GAF from a treating
> source unless it is well supported and not
> inconsistent with other evidence." SSA
> AM-13066 at 5 (July 13, 2013).

2015 WL 1608741 at 9 n.2.

Here the ALJ gave significant, not controlling, weight to GAF
scores assessed by Dr. Fenstermacher and Ms. Roeder. (R. 18.) He
did so based on Plaintiff's treatment history with Dr.
Fenstermacher, the fact that Ms. Roeder's assessment was made in
the context of a full psychological evaluation of Plaintiff, and
his conclusion that the scores were consistent with other evidence.
(R. 18.) This is not a case where the ALJ ignored GAF scores which
would indicate serious symptoms or any serious impairment in
social, occupational, or school functioning (GAF score of 41-50,
DSM-IV at 34). Because the ALJ cited reasons why he found the
scores to be well supported and Plaintiff points to no basis to
conclude that the ALJ was precluded from relying on the GAF scores
in the manner in which he did (*see* Doc. 8 at 15-16), we find this
claimed error to be without merit.

4. **Credibility**

Plaintiff's final claimed error is that the ALJ improperly

found Plaintiff's testimony about the functional limitations of her impairments not credible. (Doc. 8 at 16-18.)  We conclude the ALJ did not err on this basis.

Plaintiff contends that the ALJ could not dismiss Plaintiff's testimony about functional impairments sufficient to preclude work activity which are supported by medical evidence without pointing to contrary medical evidence. (Doc. 8 at 17 (citing *Williams v. Sullivan*, 970 F.2d 1178, 1184-85 (3d Cir. 1992)).)  Specifically, Plaintiff points to the opinions of Dr. Fenstermacher and Dr. Schneider regarding a marked impairment in responding appropriately to usual work pressure as medical evidence supporting her testimony and that of her stepfather that Plaintiff did not handle stress well.  (Doc. 8 at 17.)

While we agree with Plaintiff's general proposition, here the ALJ did not find that the alleged functional impairments were supported by medical evidence.  As discussed above, the ALJ did not err in his assessment of the opinions of Dr. Fenstermacher and Dr. Schneider regarding work pressure, and the limited weight afforded them undermines Plaintiff's argument that they provide medical evidence in support of her claimed limitations.  Furthermore, the ALJ cited several reasons why he discounted Plaintiff's alleged limitations, including contrary medical evidence.  (R. 19.) Plaintiff does not discount the reasons provided by the ALJ. Therefore, we have no basis to conclude the ALJ improperly

39

determined that Plaintiff was not fully credible and this claimed error is without merit.

### V. Conclusion

For the reasons discussed above, we have found all claimed errors to be without merit.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: August 10, 2015